**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                              **CRIMINAL NO.: 3:18cr67-CWR-LRA**

**AUBREY MAURICE JORDAN**


**ORDER DENYING MOTION TO SEVER**

Monroe Hughes and Cortez Byrd were indicted for conspiring to possess and distribute methamphetamine, and for possessing methamphetamine with the intent of distributing it.  Hughes, Byrd, and Aubrey Jordan were indicted for conspiring with each other to kill an informant, Anton Ford, by shooting him to prevent Ford from communicating with law enforcement and to retaliate against him for providing information to law enforcement.  Jordan is also charged with killing Ford, and he has moved the Court to sever his trial from his co-Defendants.

The indictment is based on the following facts, summarized from Jordan's Motion to Sever [Doc. #204], as well as the Government's response.  Anton Ford, a confidential source for the East Mississippi Drug Task Force, working with the U. S. Drug Enforcement Administration, allegedly bought methamphetamine from Hughes and Byrd in September, 2017, and again in October, 2017 -- transactions that did not involve Jordan.  On February 14, 2018, Byrd was arrested on state drug charges and detained at the Lauderdale County Jail.

Following his arrest, Byrd made several phone calls from jail, many of which included conversations with Hughes, who was not incarcerated at that time.  The Government contends that these phone calls were intended to identify the informant behind Byrd's drug charges and plan his murder.  On March 10, 2018, Ford was shot as he sat in a car outside a lounge.  The wound was serious, and Ford was transported to the University of Mississippi Medical Center in Jackson.  Ford spent some time on a ventilator, and, when he was released, he was a quadriplegic.

On April 3, 2018, Hughes and Byrd were indicted by a federal grand jury for conspiracy and possession of methamphetamine with intent to distribute.  After the shooting, Ford was interviewed on several occasions by officers from the Meridian Police Department and the DEA.  On those occasions, Ford related that he had been threatened prior to the shooting, and he identified the shooter as Aubrey Jordan.  Jordan contests those identifications, arguing that Ford's medical condition precluded them from being credible.  On May 27, 2018, a week after he was discharged from UMMC, Ford died from a pulmonary embolism.

Jordan has now filed this Motion to Sever, arguing that Ford's statements about Jordan being the shooter are inadmissible against him, as violative of the Confrontation Clause of the Sixth Amendment and Rule 802 of the Federal Rules of Evidence, prohibiting the admission of hearsay evidence.  Because he believes that Ford's statements might be admissible against his co-defendants, Jordan argues that he will be prejudiced by a joint trial to an extent that cannot be cured by limiting instructions or other means.  For that reason, Jordan contends that, pursuant to Fed. R. Crim. P. 14, his trial should be severed.

To support a request for severance, Jordan must show, not just that he will be prejudiced by the introduction of Ford's statements, but that a joint trial would prejudice him "beyond district court protection and that the prejudice outweighed any interest in the economy of judicial administration." *United States v. McClaren*, No. 17-30524, 2021 WL 1976674, at *2 (5th Cir. May 18, 2021) (citing *United States v. Rodriguez*, 831 F.3d 663, 669 (5th Cir. 2016)).  Of course, if Ford's statements are admissible against Jordan, this argument is defeated.  If they are not, then the Court must determine whether the Court can tailor relief that will protect Jordan and justify a joint trial.

Jordan's co-Defendant, Monroe Hughes, filed a Motion to Suppress earlier, also seeking to exclude Ford's statements to law enforcement.  In an Order dated March 17, 2021 [Doc. #244], this Court ruled on some of the issues Jordan has raised in this Motion to Sever.  In particular, the Court found that Ford's statements are testimonial, that the statements could be admitted under the

2

"Forfeiture Doctrine," and that a ruling on the trustworthiness of the recordings of the statements would be reserved until after a hearing.

The Forfeiture Doctrine, or forfeiture by wrongdoing, existed at common law, and it "permitted the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant." *Giles v. California*, 554 U.S. 353, 359 (2008). The doctrine is, as the Court noted in *Giles*, "a founding-era exception to the confrontation right." 554 U.S. at 358. The Supreme Court first addressed the doctrine in *Reynolds v. United States,* 98 U.S. 145 (1879). Recognizing the conflict between the doctrine and the Confrontation Clause of the Sixth Amendment, the Court held:

> The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.

*Id*. at 158.

The doctrine was codified as part of the Federal Rules of Evidence in 1997 as Rule 804(b)(6), creating an exception to the hearsay rule for "[a] statement offered against a party that wrongfully caused – or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." The purpose of the doctrine is to protect the judicial process. *Davis  v. Washington*, 547 U.S. 813, 833 (2006) ("[W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce."). The defendant who procures a witness's absence "forfeits the constitutional right to confrontation." *Id*. Simply put, "[w]hile defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that the destroy the integrity of the criminal-trial system." *Id*. (emphasis in original).

In *Giles,* the defendant was on trial for murdering his girlfriend.  He testified at trial that he acted in self-defense, because the victim was jealous and violent.  To counter this testimony, the State offered earlier statements by the victim to police that the defendant had assaulted her prior to trial and threatened to kill her if she was unfaithful.  *Id*. at 357.  The evidence was admitted under California law, which permitted the introduction of hearsay where the declarant was unavailable, and the statements were deemed trustworthy.

While Giles's appeal was pending, the Court entered its opinion in *Crawford v. Washington,* 541 U.S. 36 (2004).  There, the Court held that the Confrontation Clause required that defendants have an opportunity to confront witnesses who testify against them, except where an exception, recognized at the time that the Constitution was written, would apply.  *Id*. at 53-54.  California's appellate court recognized *Crawford*, but held that it did not change the result in Giles's case, because the forfeiture by wrongdoing doctrine existed at the time that the Constitution was written.  Applying its understanding of the doctrine, the court held that Giles had forfeited his right of confrontation because he committed the murder for which he was charged and because his criminal act eliminated the witness from testifying.  *Giles*, 554 U.S. at 357.

On appellate review, the Supreme Court vacated and remanded the case.  Justice Scalia, writing for the majority, and Justice Breyer, writing for the dissenters, agreed that the forfeiture doctrine existed at common-law and operated as an equitable doctrine to prevent a defendant from wrongfully procuring a witness's absence at trial.  They disagreed on the extent to which the doctrine applied to Giles's case.  Justice Breyer would have applied the doctrine on the record before the Court, finding that the requirement of intent was satisfied by establishing the defendant's knowledge that, by killing the witness, he would prevent her from testifying.  *Giles*, 554 U.S. at 385 (Breyer, J., dissenting).  Justice Scalia, on the other hand, believed that more was required, based on the state of the common law at the time that the Constitution was drafted; therefore, he held that there must be evidence that a defendant's purpose, or motive, was to prevent the victim's testimony.  *Giles*, 554

4

U.S. at 368.  Because the majority was of the opinion that intent had not been adequately established, the case was remanded.

Aubrey Jordan would add another layer to this test – that the only statements covered by the doctrine were those "regarding the subject matter that the witness was to testify about in the first place; i.e. the testimony the defendant sought to prevent by making the witness unavailable."  D's Mot. to Sever, p. 8.  According to his reading of *Giles*, Jordan argues that the forfeiture doctrine only applied to statements about the drug sales, and, in his case, the doctrine would not extend to statements identifying the defendant as the murderer.  Jordan cites *Giles,* 554 U.S. at 362, to contend, "The forfeiture doctrine does not apply in murder cases, i.e. in cases where the unconfronted testimonial statement consists of the victim identifying the person who shot him prior to dying."  D's Mot to Sever 9-10.  The Court disagrees.  The section of *Giles* on which Jordan relies is not the Court's holding.  It is merely a summary of common law precedent, showing that evidence of murdering a witness was not made admissible simply because the defendant was on trial for that murder, where the evidence did not show that the murder was committed to keep the witness from testifying.  554 U.S. at 361-62.

Jordan also argues that *Giles* does not apply in the context of a murder case.  He bases that claim on this statement in *Giles*:  "The notion that judges may strip the defendant of a right that the Constitution deems essential to a fair trial, on the basis of a prior *judicial* assessment that the defendant is guilty as charged, does not sit well with the right to trial by jury."  554 U.S. at 365.  The Court went on to quote *Crawford*, "It is akin, one might say, to 'dispensing with jury trial because a defendant is obviously guilty.'"  *Id.* (quoting *Crawford*, 541 U.S. at 62).  Again, the Court disagrees with Jordan's view.

Justice Scalia, writing for the majority, had summarized several common law cases in which "the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying – as in the typical murder case involving accusatorial statements

5

by the victim – the testimony was excluded unless it was confronted or fell within the dying

declaration exception." 554 U.S. at 361-62. He explained that the conclusion from those cases that

was advanced by the State and by the dissent was that the testimony should be admitted for the

simple reason that the defendant had prevented the witness from attending and should not be

permitted to benefit from his wrongdoing. *Id*. at 365. The majority held, however, that the

wrongdoing in question also had to be conduct "designed to prevent a witness from testifying." *Id.*

In other words, the Court held that the testimony had to go beyond simply showing that the defendant

had prevented the witness from attending, or, as in Giles's case, that the witness was unavailable

because the defendant killed her. It was in that context that he wrote, "The notion that judges may

strip the defendant of a right that the Constitution deems essential to a fair trial, on the basis of a prior

*judicial* assessment that the defendant is guilty as charged, does not sit well with the right to trial by

jury." *Id*.

Justice Souter's concurrence elaborates on this statement. Agreeing that the doctrine

required proof of intent to prevent a witness testifying, he said, "The importance of that intent in

assessing the fairness of placing the risk on the defendant is most obvious when a defendant is

prosecuted for the very act that causes the witness's absence, homicide being the extreme example."

*Id*. at 379. In such a case, "If the victim's prior statement were admissible solely because the

defendant kept the witness out of court by committing homicide, admissibility of the victim's

statement to prove guilt would turn on finding the defendant guilty of the homicidal act causing the

absence; evidence that the defendant killed would come in because the defendant probably killed."

*Id*. To avoid this circular reasoning, which has the effect of blurring the line between the function of

the judge and the jury, Justice Souter agreed that the evidence can only be admitted on a finding of

intent to prevent testimony.

Here, the State has produced evidence showing that, after their arrests, Defendant Monroe

Hughes and Defendant Cortez Byrd, communicated with each other to identify the informant who

informed law enforcement that Hughes and Byrd were selling drugs.  From their conversations, it is clear that they believed that they had identified him, and they were planning to have him murdered. Early in the evening of March 10, Defendant Byrd called his girlfriend and told her to stay home that evening, because "I got something planned."  Gov't Resp. 2.

Just a day before that conversation, Ford called an officer on the drug task force to tell him that someone had told Ford that Byrd knew the identity of the informant.  During the Meridian Police Department' later investigation, they interviewed Ford's girlfriend, who told them that Ford received a phone call on March 9 about being a snitch.  Ford's mother told police that Ford said he got a call on March 8 or 9 about Ford setting people up.  On March 10, Ford was sitting in a car in the parking lot of a lounge when he saw a vehicle pull up, occupied by Hughes, someone who looked like Hughes's girlfriend, an unidentified man, and Aubrey Jordan.  Jordan got out of the car, ran up to Ford's car, and shot him.  Dearman Aff. 12.

Later phone calls between Byrd and others included thinly designed code asking things like, "How many balls you ended up shooting in?"  In one of the conversations, Henry Gibbs told Byrd that Hughes was "trying to break a horse," but that it was "still cooking."  Later Gibbs related this statement from Hughes, "For them to keep him on the machine, they charge 'em up by the day. Can't afford, can't afford to keep doing it."  When Byrd asked whether it was lung failure or heart failure, Gibbs said, "I think it heart failure tho and they got him on that, ah, they got him on that life support machine."  At this time, Ford was on life support at UMC.

The scenario advanced by the Government, therefore, is that Ford was a drug informant who bought drugs from Byrd and Hughes.  After Byrd was arrested, through conversations with Hughes, they identified Ford as the informant.  Byrd and Hughes then conspired to have Ford killed, and Jordan, after arriving in a car with Hughes at Ford's location, shot him.  All this is evidence that the purpose for shooting Ford was to prevent his testimony at trial.

Later cases citing *Giles* are in accord, notably *United States v. Gurrola*, 898 F.3d 524 (5th Cir. 2018).  *Guirrola* reiterated that to satisfy the test for admitting the statements of a party made unavailable by the defendant, the party offering the evidence must show, by a preponderance of the evidence, that the defendant's purpose was to keep the witness from testifying.  *Id*. at 534-35.  In another case from the Southern District of Ohio, the court described the process to be used in determining whether the purpose of making a witness unavailable was to prevent trial testimony.  *United States v. Ledbetter*, 141 F. Supp. 3d 786, 790 (S.D. Ohio 2015).  There, the court held that the Government must show by a preponderance of the evidence that the defendant's conduct was designed to ensure unavailability.  *See also Hand v. Houk*, No. 2:07cv846, 2011 WL 2446383, at *26 (S.D. Ohio Apr. 25, 2011) and the cases cited therein.   The Government may rely on hearsay to make that showing, and preventing testimony need not have been the defendant's only purpose.  *Id*.  The preponderance standard applies even where a defendant is prosecuted for the crime that made the witness unavailable.  *Id*. at 790-91; *see also United States v. Adoma*, 781 F. App'x 199, 204 (4th Cir. 2019); *United States v. Vallee*, 304 F. App'x 916, 920-21 (2d Cir. 2008) (finding that testimony of witness made unavailable when defendant killed her to prevent her testimony was admissible both in the drug trial in which she was to testify and in the prosecution for her murder); *United States v. Carson*, 455 F.3d 336, (D.C. Cir. 2006) (finding of forfeiture justified and statements could be admitted against all of the co-conspirators where the evidence showed the defendants' activities leading to the murder, their motive for murdering the witness, their hunt for him, their failed opportunities, and the advice from one defendant to another to avoid the location of the killing); *Soto v. Cameron*, No. 14-1331, 2015 WL 7965105, at *7 (E.D. Penn. July 15, 2015).

Jordan finally argues that the forfeiture by wrongdoing doctrine should not be applied to counts 6 and 7, because those counts charged Jordan with retaliation, not with causing Ford to be absent at trial.  He concludes, therefore, without citation to authority, "the forfeiture by wrongdoing exception is inapplicable on its basic terms, without need for further analysis."  D's Mot. 10 n.1.

8

Further analysis might have been useful to support this contention.  Jordan cites no authority, and the Court has found none, that holds that the intent to prevent testimony must be set out in an indictment.

As was earlier determined in ruling on Monroe Hughes's Motion to Suppress, the Government has put forward sufficient evidence to demonstrate that Anton Ford was killed to prevent his testimony.  The same reasoning, and the same result, should apply here.  Although this ruling is subject to a later finding that the statements are trustworthy, because the evidence in question is admissible against all of the Defendants, the Motion to Sever will be denied.

**IT IS, THEREFORE, ORDERED** that Defendant Aubrey Jordan's Motion to Sever [204] is **DENIED**.

**SO ORDERED AND ADJUDGED** this the 9th day of June, 2021.

s/ Carlton W. Reeves
CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE